IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ELAINE WARREN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.1:12-cv-830-CSC |
| | ) | (WO) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

On October 2, 2006, Elaine Warren filed an application for a period of disability and disability insurance benefits, alleging disability beginning September 28, 2006. (R. 9). After the claim was initially denied, Warren filed a timely written request for a hearing before an administrative law judge ("ALJ"), who, after a hearing on July 28, 2008, denied the claim. (R. 9, 21). Following Warren's appeal of an affirmance by the Appeals Council, this court remanded the case on the motion of the Commissioner, and the Appeals Council remanded the case to the ALJ. *M.D. Ala. Case No.* 1:09-cv-897 (R. 613, 617-620). Because another ALJ had found, on a subsequent application, that Warren was disabled as of August 27, 2008, the sole issue before the ALJ on remand of this case was whether Warren was disabled from September 28, 2006 until August 27, 2008. (R. 520, 619). Following a hearing on February 26, 2011, the ALJ issued an opinion on March 2, 2011, finding that Warren was not disabled during the time period at issue. (R. 530). On July 17, 2011, the Appeals Council

denied Warren's request for administrative review. (R. 652). The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner"). See *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[1] The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[2] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the claimant presently unemployed?
> (2)  Is the claimant's impairment severe?
> (3)  Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

---

[1]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[2]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 20 CFR §§ 404.1508; 20 CFR § 416.908.

(4)  Is the claimant unable to perform his or her former occupation?
(5)  Is the claimant unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

[The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[3]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

### III.  The Issues

**A.  Introduction.** Warren was born on January 31, 1956, and was 50 years old on the alleged date of disability onset.  (R. 31).  She has a 12th grade education.  (R. 542).  Her past employment history includes work as a garment inspector and door assembler.  (R. 46).  Warren alleges that she is disabled due to the following medical conditions: breast cancer in remission following bilateral mastectomies and reconstructions, osteoarthritis, hypertension, gastroesophageal reflux disease, degenerative disc disease, degenerative joint disease, chronic tendonitis and bursitis in her right shoulder, lymphedema, arthritis in her knee, depression, anxiety, posttraumatic stress disorder, and paranoid personality disorder.  (R. 522, 554).

**B.    The Findings of the ALJ**

The ALJ found that Warren met the insured status requirements of the Social Security Act through December 31, 2010.  (R. 522).  Further, the ALJ found that Warren had the following severe impairments:

> breast cancer in remission status post bilateral mastectomies and reconstructions, osteoarthritis, hypertension, gastro[]esophageal reflux disease, degenerative disc disease cervical spine, degenerative joint disease, chronic tendonitis/bursitis right shoulder, depression, anxiety, posttraumatic stress disorder, and paranoid personality disorder.

(R. 522).

The ALJ concluded that Warren did not have an impairment or combination of impairments that met or medically equals any of the listed impairments in 20 C.F.R. Part 404,

4

Subpart P, Appendix 1.  (R. 523).

The ALJ found that, through August 26, 2008, Warren

> had the residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) except that [Warren] cannot push against resistance with her
> right upper extremity or bilateral lower extremities. [Warren] cannot reach
> overhead with her right upper extremity but she is not precluded from reaching
> with her right upper extremity. [Warren] cannot climb ladders, ropes, or
> scaffolds. [Warren] can rarely, *i.e.*, no more than 10% of the workday, climb
> ramps, stairs, crouch, kneel, or crawl. [Warren] may alternate between sitting
> and standing at the workstation throughout the workday. [Warren] can write
> for no more than 10% of the workday. [Warren] can perform simple, routine,
> tasks. [Warren] may be off task  or work at a nonproductive pace up to 5% of
> the workday due to deficits in concentration, persistence or pace caused by
> pain and psychological factors.

 (R. 524-25).

The ALJ also found that, "[t]hrough August 26, 2008, considering [Warren's] age,

education, work experience, and residual functional capacity, there were jobs that existed in

significant numbers in the national economy that [Warren] could have performed." (R. 529).

Specifically, the ALJ found that, during the relevant time period, Warren had the residual

functional capacity to perform the jobs of

> ticket taker/seller, DOT Code 211.467-030 (approximately 450,000 jobs in the
> national economy, 1,250 in the state); medical supplies packer, DOT Code
> 920.686-038 (approximately 325,000 jobs in the national economy, 800 in the
> state); and car wash attendant, DOT Code, 915.667-010 (approximately
> 300,000 jobs in the national economy, 1,200 in the state).

(R. 530).

Therefore, the ALJ found that Warren was not disabled from the alleged onset date

of September 28, 2006, through August 26, 2008.  (R. 530).

C.    **Issues.**

As stated by Warren, the issues for review are as follows:

1.    Whether the ALJ committed reversible error in failing to acknowledge and provide good cause to reject the treating physicians' opinions;

2.    Whether the ALJ erred by failing to base her finding on substantial evidence;

3.    Whether the ALJ erred in [im]properly evaluating the claimant's residual functional capacity (in finding that the claimant is capable of performing light work on a full time basis); and

4.    Whether the ALJ sustained her burden of establishing that the re is other work in the national economy that the claimant is capable of performing in accordance with the Appeals Council's remand order.

(Doc. 11 p. 1).

## IV.  Discussion

**A.    The ALJ did not err in rejecting medical opinions of treating medical sources that were unsupported by the medical evidence or that were on issues reserved to the Commissioner.**

**1.    Warren's Mental State and the Psychotherapist's Opinion**

On January 24, 2006, Dr. Douglas H. Jones noted that Warren stated "she is under a great deal of stress recently." (R. 375). Dr. Jones diagnosed Warren with fatigue, insomnia, and anxiety, but did not prescribe medications for those conditions. (R 375). Dr. Jones directed Warren to return in two months "for follow-up and health maintenance issue review, earlier of course" if needed. (R. 376)

On January 23, 2006, Warren's oncologist made the following treatment notes and

observations:

> Elaine is doing well.  She is in a delightful mood today.  She is complaining
> of getting older.  Her 50th birthday is next week.  She is in good spirits. . . .
> Assessment: Stage II-B, estrogen receptor negative breast cancer; status post
> TAC chemotherapy, now 3 ½ years since diagnosis without evidence of
> recurrence . . . She normally feels somewhat anxious when here in the
> oncology office.

(R. 299).

On March 21, 2006, during a follow-up visit, Dr. Jones noted "no mental status
change.  No sleep problems except for some fatigue and only occasional mild insomnia, but
nothing profound."  (R. 374).

On October 31, 2007, during a routine examination, a nurse practitioner noted that
Warren did not appear to be uncomfortable and exhibited no psychological symptoms.  (R.
448).

During  routine examinations, on November 8, 2007, November 29, 2007, April 11,
2008, and May 9, 2008, nurse practitioner Candace M. Hobbs noted "no psychological
symptoms."  (R. 450, 454, 463, 466).

On June 2, 2008, Warren referred herself to psychotherapist Dr. Theron Covin, Ed.D.,
for evaluation and treatment.  (R. 424).  Covin is not a licenced physician or psychologist.
After evaluating Warren, Dr. Covin issued a report in which he concluded as follows:

> Diagnostic Impressions:    Axis 1: Post Traumatic Stress Disorder
> Axis II: Paranoid Personality Disorder
> Axis III: See medical history
> Axis IV: Status post breast cancer;
>            personal health issues; chronic

7

health problems of husband.

Axis V: 45

Prognosis is poor. Her conditions seem chronic. She is totally and permanently disable[d].

(R. 424-30).

On June 3, 2008, Warren complained of depression and anxiety to Nurse Practitioner

Hobbs.  Nurse Hobbs made the following findings:

History of present illness: The Patient is a 52 year old female. Source of patient information was patient. . . . Anxiety and depression. No stated intent to commit suicide and no previous suicide attempt. No homicidal thoughts pt states she has been having depression, sadness, anxiety, panic attacks off and on x 1 year, getting worse and states she has not felt like talking with me (PCM) about theses issues. Says she lost sister to cancer, dad died last year to cancer, brother was shot, and another sister also deceased. Pt talked to Dr. TM Covin yesterday and he suggested that she come here for medication and he would consider to counsel. Assured both pt and husband that referral is not needed. Checked and Dr. Covin in not network provider - pt and husband aware.

. . . .

Psychological symptoms: Insomnia.

. . . .

Mental Status Findings: • Mood was depressed. • Mental status was normal. • Appearance was normal. • Clothing was not dishevelled. • Mood was not anxious. • Affect was not inappropriate.

(R. 473).

Nurse Hobbs diagnosed depression and anxiety, instructed Warren to "continue

counseling as planned" and return "for any concerns otherwise [follow up] in one month to

8

discuss treatment." (R. 473). Nurse Hobbs prescribed Aprazolam and Fluoxetine for depression and anxiety. (R. 473).

On July 7, 2008, when Warren returned for a follow-up visit, Nurse Hobbs noted that Warren "continues with therapy for depression issues. Doing well." (R. 477).

On October 1, 2008, Nurse Hobbs noted: "Depression med refilled. [Warren] feels the current medication(s) are working well. [Warren] has no complaints or problems with the medications." (R. 493).

On October 14, 2008, Nurse Hobbs noted: "Depression med refilled. [Warren] feels the current medications are working well. [Warren] has no problems with the medications." (R. 488).

If Dr. Covin's opinion constituted the opinion of an acceptable medical source, 20 C.F.R. § 404.1513, the ALJ would have been obliged to give substantial weight to that opinion. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). But Dr. Covin is not an acceptable medical source within the meaning of the regulations; thus, the ALJ cannot be faulted for not giving Covin's opinion weight.

Moreover, an ALJ is entitled to disregard the opinion of a treating physician or an acceptable medical source when the record substantially supports the conclusion that "the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

9

To begin with, Dr. Covin's statement that Warren "is totally and permanently disable[d]," (R. 430), R. 430, is an opinion on an issue that is reserved to the Commissioner and is not a medical opinion entitled to any special weight. 20 C.F.R. § 404.1527(d)(1).[4]  And, in this case, the ALJ rejected Dr. Covin's opinion about the severity and disabling effects of posttraumatic stress disorder, anxiety, and depression, on the following grounds:

> As for the claimant's alleged depression, anxiety and hallucinations, the undersigned notes that the events which reportedly triggered her symptoms occurred mostly in the remote past. There is no longitudinal history of treatment. The claimant has never made any such complaints to any of her primary care physicians, and none of them reported observing any symptoms of anxiety or depression. In particular her oncologist, Dr. Dunn, paid specific attention to her mood and commented on it, but never described any significant depression or anxiety (Exhibits 18F, 29F). The claimant's primary care physicians, none of whom are mental health specialists, diagnosed the claimant with depression and anxiety in June 2008 (Exhibit 30F) apparently after she had seen Mr. Covin the previous day and was referred for medications. Even then, the claimant did not report any hallucinations or paranoia to her primary care physician. The diagnoses of anxiety and depression were made based entirely on the claimant's subjective complaints, as no clinical findings are recorded. In general, in spite of her extensive medical treatment, the claimant seems to have remained quite well-adjusted, and she never complained of any mental or emotional symptoms at all until just before the initial hearing. The claimant worked for many years despite her alleged depression and anxiety. The claimant's recent complaints of psychotic symptoms are not considered credible. The claimant may have some symptoms of anxiety and depression, but there is no credible evidence that any such symptoms have an appreciable effect on her functioning. The undersigned has nonetheless given the claimant

---

[4]"Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as the examples that follow, are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability. [] Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(d)(1).

the benefit of the doubt and limited her to simple, routine tasks with nonproductive pace work permitted up to 5% of the workday.

. . . .

Given the utter lack of any other objective or anecdotal evidence suggesting any significant emotional disturbance, the undersigned gives little weight to Mr. Covin's report or conclusions. According to the Diagnostic and Statistical Manual of Mental Disorders (4th edition) (DSM-IV), in light of a medicolegal context of presentation and the motive of obtaining financial compensation, the possibility of false or exaggerated symptoms must be considered. Instead, subjective complaints and test results were taken at face value. Mr. Covin's diagnoses of posttraumatic stress disorder and paranoid personality disorder and his conclusion are not supported by credible objective findings or by the balance of the medical evidence of record. Moreover, Mr. Covin's conclusion that the claimant is disabled addresses an issue reserved to the Commissioner.

In sum, the above residual functional capacity assessment is supported by a preponderance of the most credible objective evidence of record, including treatment notes, minimal objective diagnostic findings, and a dearth of mental health treatment.

(R. 527-28).

The ALJ's stated reasons for rejecting Dr. Covin's opinion are supported by the record.  The court notes that, prior to referring herself to Dr. Covin (who noted that Warren had "applied for Social Security benefits due to her past and current health problems"), the extensive medical record contains only limited instances of treatment for mild anxiety, notably during times of stress (R. 299, 375), and "mild insomnia, but nothing profound." (R. 374).   As the ALJ indicated in her opinion (R. 527), Warren's complaints of severe psychological symptoms occurred in June 2008 (R. 424-30, 473) and the first administrative hearing in this case occurred on July 28, 2008 (R. 621).  Thereafter, contrary to Dr. Covin's

opinion that Warren's prognosis was so poor that she was totally and permanently disabled due to mental impairments, the medical record establishes that, after consulting Dr. Covin and Nurse Hobbs, Warren reported that she was "doing well" on medications for anxiety and depression, and that the medications were working well. (R. 477, 488, 493). Accordingly, the ALJ's clearly-articulated reasons for rejecting Dr. Covin's opinion are supported by the evidence and constitute "good cause" for disregarding that opinion. *Phillips*, 357 F.3d at 1241.

**2.      Dr. Dunn's January 16, 2009 Letter**

On January 16, 2009, Dr. Dunn wrote a letter "to whom it may concern" stating that Warren suffered "some limitation in her activities due to surgery and chemotherapy and breast reconstruction surgery in 2002 and 2003" and that "more recently she has been limited in terms of her right upper extremity weakness and swelling and decreased range of motion." (R. 720). Dr. Dunn further stated: "Due to the chronicity of these complaints and the original diagnosis of breast cancer that necessitated the chemotherapy, surgery, and reconstruction, it is my opinion that [Warren] is totally disabled and will not have a recovery of the right upper extremity function that will allow her to maintain or obtain gainful employment." (R. 720).

Warren contends that the ALJ erred in not acknowledging Dr. Dunn's January, 16, 2009 letter in her opinion. However, Dr. Dunn's letter, which includes statements about "recent" right upper extremity limitations, postdates the relevant time period, which is from

12

September 28, 2006 until August 27, 2008.  (R. 720).  The Commissioner has already determined that Warren was disabled after August 27, 2008.

Further, to the extent that Dr. Dunn opined in 2009 that in 2002 and 2003, Warren suffered from breast cancer, mastectomy, and breast reconstruction surgery, and that, "more recently," she had suffered from severe limitations in her right upper extremity, the ALJ clearly did not discount these limitations and, in fact, found them to be "severe impairments." (R. 522).   However, an opinion from a medical provider on issues reserved to the Commissioner, such as opinions regarding the claimant's residual functional capacity and opinions that a claimant is "totally disabled," is not a medical opinion and is not due any significant weight.  20 CFR § 404.1527(d).  Thus, the ALJ was not required to articulate specific reasons constituting "good cause" for failing to accord substantial weight to Dr. Dunn's opinion that, due to a history of breast cancer and right upper extremity limitations, Warren was "totally disabled" and would not recover sufficient right upper extremity function to allow her to maintain or obtain gainful employment.  *Id.*; *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)  (holding that, in requiring the ALJ to afford substantial weight to a physician's opinion absent "good cause" to the contrary, "we are concerned . . . with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinions of the legal consequences of [the claimant's] condition. Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings.").

Further, the court has reviewed the record and finds that the evidence substantially supports the ALJ's stated reasons for her determination regarding the functional limitations caused by Warren's breast cancer, mastectomy, breast reconstruction surgery, and pain in her right shoulder. Accordingly, the ALJ did not commit reversible error by failing to state reasons for affording no special weight to Dr. Dunn's opinion that Warren was " totally disabled and will not have a recovery of the right upper extremity function that will allow her to maintain or obtain gainful employment." (R. 720). 20 CFR § 404.1527(d).

**B.    The ALJ Did Not Err by Partially Crediting Warren's Subjective Complaints of Pain.**

Warren argues that the ALJ erred in discounting her subjective complaints of pain. Warren does not specifically identify the subjective pain testimony to which she refers; however, she claims that "medical records and testimony offer evidence of underlying medical conditions including [d]egenerative [j]oint [d]isease, arthritis, [and] severe disc deterioration of her back as well as post breast cancer difficulties." (Doc. 11 p. 10).

"[A] three part 'pain standard' . . . applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). When a claimant presents subjective testimony that meets this standard,

14

the ALJ has the discretion to determine whether that testimony is credible; however, "[i]f the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id*.

In this case, the ALJ found that Warren had submitted subjective testimony of pain accompanied by evidence of underlying medical conditions that could reasonably be expected to cause her alleged symptoms. (R. 525). However, the ALJ stated the following reasons for concluding that Warren's testimony was not credible to the extent that it conflicted with the ALJ's residual functional capacity determination:

> As for the claimant's subjective allegations of pain, the claimant's allegations are not fully credible. Although the claimant has degenerative joint disease with a history of treatment for mild osteoarthritis, tendonitis and bursitis, the clinical findings have been minimal (Exhibits 21F, 27F, 30F), as have the results of x-rays and other diagnostic work-up (Exhibits 13F, 20F, 21F, 23F). Treatment modalities have been limited to analgesic medication, a knee injection administered in September 2006 (Exhibit 21F), and physical therapy during November 2006 (Exhibit 22F). Treatment notes generally show normal range of movement in all extremities (Exhibit 30F). Although the claimant occasionally reported flare-ups of moderate pain, treatment notes also show that the claimant regularly reported no pain or only mild pain, was in no acute distress and released with no limitations (Exhibit 30F). The undersigned acknowledges that the claimant may have some problems using her right arm and shoulder, but in light of the minimal objective findings, her complaints of severe pain appear to be somewhat exaggerated. The undersigned has nonetheless given the claimant the benefit of the doubt and limited her to light work with no overhead reaching, no pushing against resistance with her right upper extremity and writing no more than 10% of the workday. The undersigned has likewise restricted the claimant from pushing against resistance with her bilateral lower extremities, climbing ladder, ropes, and scaffolds, and rarely climbing ramps, stairs, crouching, kneeling, and crawling to accommodate her back and knee pain. The undersigned also notes that the limitation to simple, routine tasks with nonproductive pace work permitted up to 5% of the workday would also accommodate the claimant's pain and any

associated difficulties concentrating.

Additionally, at the initial hearing, the claimant testified that her shoulder problems originated with her cancer-related surgeries but treatment notes show that the claimant tolerated the surgeries well (Exhibits 5F-12F, 17F) and did not complain of any significant shoulder problems to her oncologist. Rather, follow-up records from her gynecologist (Exhibits 17F and 28F), her oncologist (Exhibits 18F and 29F), and her surgeon (Exhibit 19F) reflect a good response to treatment without any complications. The claimant continued to work in spite of breast cancer, only quitting when the plant where she worked closed in May 2006. Although there is scant evidence to support her allegations, the undersigned has given the claimant some benefit of the doubt in including appropriate functional limitations in the residual functional capacity finding.

With respect to the claimant's alleged difficulties sitting, standing, and walking for prolonged periods, although the record documents occasional complaints of back and knee pain, there is no evidence of specific complaints related to sitting, standing, or walking or evidence of treatment for these difficulties. Rather, treatment notes show a normal gait, stance, and balance (Exhibit 30F).

(R. 525-26).

The medical record substantially supports the findings of the ALJ with regard to the credibility of Warren's subjective testimony.  In February, 2005, a routine yearly exam was unremarkable and Warren was noted to be "doing well without any complaints."  (R. 247). On January 24, 2006, Dr. Jones noted "[n]o gait or balance trouble.  No knee joint or ankle joint instability."  (R. 375).

On February 23, 2006, Dr. Sherry L. Roach noted

Elaine is in today for a recheck of her breasts. . . . No problems with her breasts.  PHYSICAL EXAM: Essentially unremarkable.

(R. 334).

16

On July 24, 2006, Dr. Dunn noted:

Elaine is doing well.  She describes no bone pain or anorexia.  She is not bothered by lymphedema in either extremity.  She has good results from her bilateral breast reconstruction. . . . [F]or the most part, her bilateral breast reconstruction . . . [has] heald nicely. . . . Extremities without edema.

(R. 298).

On September 28, 2006, the alleged onset date, Dr. Veneziano noted that Warren

is complaining of left swollen knee for three days, having a lot of discomfort. Aleve bid helps some.  She is also having some right knee pain as well as right shoulder discomfort mostly in the morning some lymphedema. . . . . She is on her knees a fair bit due to her job.  She is not wearing any knee protection. This is the likely source of her difficulties.  Patient is instructed to use knee protection consistently.  She is also wearing shoes that have high, thin heel[s] with no arch support or padding. When she demonstrated walking, she was not able to keep her ankles straight. . . . Patient [had] good range of motion to the right shoulder with some tenderness over the bursa and bicepital tendon. There is an effusion with pain on range of motion to the left knee with a little crepitus.  The right knee has good motion, nearly no pain without motion.  No effusion.

(R. 372).

Dr. Veneziano diagnosed Warren with degenerative joint disease of the knees with effusion on the left and bursitis and tendinitis in the right shoulder.  He prescribed pain medications and knee pads for work and appropriate foot wear at all times.  (R. 372).

On October 5, 2006, Dr. Roach made the following treatment notes:

Elaine is in today for a recheck. She's complaining of just generally not feeling well.  She states all of her joints are hurting.  She's actually now filed for disability.  No specific aches and pains, just generally feeling bad.

PHYSICAL EXAM: Reveals trace edema in her right upper extremity. Mastectomy site looks good.  Left breast is normal.  There is no axillary supraclavicular adenopathy.  Abdominal exam is within normal limits.

. . . .

PLAN: I am going to go ahead and set her up for a bone scan just to be sure that she doesn't have any significant metastatic disease, and then we will have her return as needed.

(R. 333).

On October 19, 2006, Dr. Veneziano made the following observations:

Patient is complaining of left leg and back pain. She had a bone scan done about 10 days ago, was negative . . . . Lodine and Ultram helped her but she never got the knee pads. "I'm filing for disability." She was told years ago she had some kind of rotator cuff problem. She claims that she has cervical disc disease, C5-C6-C7 level. She was seen by Dr. Becker. Conservative treatment was contemplated and planned. Her knee improved a little after the injection but then she claims it got worse.

. . . .

She does have some tenderness about the left low back at about the L5 level. Straight leg raise is questionable bilaterally. She is having more knee pain on flexion and extension. Leg strength is symmetric and normal. . . .

IMPRESSION
1.  Cervical and lumbosacral pain with history of cervical disk disease.
2.  [Degenerative joint disease] of the lumbosacral spine.
3.  Bursitis.
4.  Tendinitits right shoulder.
5. DJD.
6. Questionable radicular symptoms.
7. History of breast cancer with negative bone scan.

(R. 369).

On November 14, 2006, Dr. Veneziano made the following notes:

Seen by ortho, getting physical therapy. Patient has gone there three times and she said she is having some soreness. I have asked her to persist, that probably doing some range of motion exercises [is] improving her endurance and she is just getting some muscle fatigue. . . . Dr. Brooks offered no surgery or x-

18

rays.  He did inject her shoulder.  Letter from Dr. Brooks dated 10/31/06 reveals his impression to be right shoulder inflammation along with chronic neck, back pain and mild knee arthritis. . . . MRI of the cervical spine with no significant changes.  No herniated disc.

. . . .

IMPRESSION:
1.  Hypertension . . . .
2.  Joint pain, probably early osteoarthritis.
3.  Bursitis.
4.  Tendonitis.

(R. 369).

On December 6, 2006, Dr. Veneziano noted that Warren's tendinitis was stable and an "MRI of the shoulder last week was good.  No rotator cuff tear.  She is not getting surgery."  (R. 434).   A December 20, 2006 radiology report indicated only "mild" osteoarthritis in Warren's left knee.  (R. 399).  On January 29, 2007, Dr. Dunn noted that Warren had complained of "some bone pain this year for which she has been on a pain medicine and as been seen by Dr. Brooks and Dr. Veneziano in Enterprise."  (R. 443).  On April 4, 2007, Dr. Veneziano noted that Warren's bursitis and tendinitis were "stable with medications."  (R. 433).

On July 30, 2007, Dr. Dunn noted:

Elaine has gotten married since her last visit.  She is doing well and has no health complaints.  She is not having significant pain for arthritis but still is concerned about discomfort in the right shoulder and back. . . . Range of motion is adequate, but she still has referred to pain in the right shoulder. History of arthritis evaluated with MRI and bone scans that are consistent with arthritis and no evidence of bone metastasis.  She still has referred pain that is

19

frightening, and she often needs an anti-inflammatory for this but tries to avoid narcotics.

(R. 442).

On September 18, 2007, Nurse Hobbs noted that Warren had "normal movement of all extremities."  (R. 446).  On October 31, 2007, Nurse Hobbs noted that Warren exhibited "no musculoskeletal symptoms."  (R. 448).

On October 31, 2007, Dr. Dunn noted, "Eliane is doing very well.  She has no complaints of right upper quadrant pain or nausea."  (R. 441).

On November 8, 2007, Nurse Hobbs noted that Warren complained of "left knee tenderness for several days states 'it's just arthritis[.]' She is ambulatory without difficulty[.] Knee joint stiffness on the left.  The knee did not suddenly 'lock up,' the kneecap does not feel 'out of place' and no bone pain in the knee.  No breast symptoms patient has history of breast cancer, last chemo treatment in Dec[ember] 200[2].  Dr. Dunn is her oncologist.  She is doing well. . . . Normal movement of all extremities."  (R. 449-50, R. 503).

On November 29, 2007, Nurse Hobbs noted Warren had "is doing well - no complaints . . . . normal movement of all extremities."  (R. 454).  On December 26, 2007, April 11, 2008, and May 9, 2008, Nurse Hobbs noted Warren had "normal movement of all extremities."  (R. 459, 463).

On July 7, 2008, Nurse Hobbs noted that Warren was "[d]oing well.  Says Motrin

20

helps arthritis better than Etodolac. . . . Normal movement of all extremities." (R. 477).

In sum, the extensive medical record substantially supports the ALJ's determination that, despite subjective complaints of severe limitations, Warren was functionally limited but not totally disabled by pain due to degenerative joint disease, osteoarthritis, tendonitis, bursitis, and her history of breast cancer treatment. (R. 525-26). Accordingly, the ALJ did not err in discounting Warren's subjective complaints of pain because, as the ALJ explained, the medical record does not support the severity of those complaints. *Holt*, 921 F.2d at 1223 (holding that an ALJ has discretion to discredit a plaintiff's subjective complaints as long as he provides "explicit and adequate reasons for his decision").

## C.     The ALJ's Residual Functional Capacity Determination is Supported by Substantial Evidence.

The ALJ determined that, through August 26, 2008, Warren had the residual functional capacity

> to perform light work as defined in 20 CFR 404.1567(b) except that [Warren] cannot push against resistance with her right upper extremity or bilateral lower extremities. [Warren] cannot reach overhead with her right upper extremity but she is not precluded from reaching with her right upper extremity. [Warren] cannot climb ladders, ropes, or scaffolds. [Warren] can rarely, *i.e.*, no more than 10% of the workday, climb ramps, stairs, crouch, kneel, or crawl. [Warren] may alternate between sitting and standing at the workstation throughout the workday. [Warren] can write for no more than 10% of the workday. [Warren] can perform simple, routine, tasks. [Warren] may be off task or work at a nonproductive pace up to 5% of the workday due to deficits in concentration, persistence or pace caused by pain and psychological factors.

(R. 524-25).

"Light  work involves lifting no more than 20 pounds at a time with frequent lifting

or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very

little, a job is in this category when it requires a good deal of walking or standing, or when

it involves sitting most of the time with some pushing and pulling of arm or leg controls. To

be considered capable of performing a full or wide range of light work, [the claimant] must

have the ability to do substantially all of these activities."  20 CFR § 404.1567 (b).

Warren argues that she cannot perform light work because she cannot "sit, stand or

stand [sic] to a significant degree based on testimony and medical records that indicate that

she experiences severe pain in her should[er] when walking." (Doc. 11 p. 12).  The evidence

cited by Warren does not support the proposition that shoulder pain affects Warren's ability

to sit, stand, or walk at any time, and particularly during the time period at issue.  (R. 38-39,

125, 302).

Warren also argues that she cannot perform light work because "[m]edical records .

. . indicate that she cannot sit for most of the time and push and pull using arm and leg

control[s] due to arthritis, degenerative joint disease, tendinitis, and general pain." (Doc. 11

p. 12).  The evidence cited by Warren in support of this proposition, as well as the record as

a whole, does not indicate that Warren will be unable to alternate sitting and standing as

determined by the ALJ.  Further, although the cited evidence indicates that Warren has pain

that limits motion in her left knee, right hand, right shoulder, back, and neck (R. 39, 377, 398, 459[5]), the ALJ found that these limitations did limit Warren's ability to push and pull leg controls. (R. 524-25). The reasons stated by the ALJ, as well as the record as a whole, substantially support the ALJ's residual functional capacity determination.

Warren also argues that she cannot perform light work because she cannot "work at a production rate described as physically demanding, which entails constant pushing or pulling of materials [even though the weight of those materials is negligible] since she is right-handed and using her left hand is awkward (R. 126) along with the ALJ finding that the claimant cannot push against resistance with her right upper extremity or bilateral lower extremities." (Doc. 11 pp. 12-13) (sic). However, the ALJ credited Warren with limitations in the ability to push against resistance with her right upper and bilateral lower extremities. The evidence cited by Warren, which is not medical evidence, does not support the proposition that Warren's alleged awkwardness in using her left hand would prevent her from performing a limited range of light work involving pushing or pulling of materials of negligible weight at a production pace. (R. 126).

Warren argues that, because she allegedly cannot perform the full range of light work, she can only perform sedentary work, and, therefore, the ALJ erred in concluding that she

---

[5]Warren cites a medical record at R. 459 in support of her argument; this medical record indicates only that, on December 26, 2007, Warren exhibited "normal movement of all extremities." (R. 459).

can perform a limited range of light work.  (Doc. 11 pp. 11-13).  However, Warren cites no authority, and the court is aware of none, which supports the proposition that a claimant who can perform less than a full range of light work is automatically limited to performing only sedentary work.  *Cf.* 20 CFR § 404.1545(a)(1) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the *most* you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record." (emphasis added)).

The ALJ fully accounted for the limitations on Warren's ability to perform the full range of light work, and the reasons stated in the ALJ's opinion, as well as the record as a whole, substantially support that determination.  Therefore, the ALJ did not err in finding that Warren had the residual functional capacity to perform less than a full range of light work.

**D.     The ALJ Did Not Err in Relying on the Testimony of the Vocational Expert**

The ALJ determined that Warren was unable to perform her past relevant work. Therefore, the ALJ proceeded to the next step of the sequential analysis, at which a finding of disability is required unless the ALJ "articulate[s] specific jobs that the claimant is able to perform," in light of the claimant's residual functional capacity, age, education, and work experience. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). "[T]his finding must

24

be supported by substantial evidence, not mere intuition or conjecture." *Id.*

In this case, the ALJ determined that, through August 26, 2008, Warren had the residual functional capacity to perform light work with some limitations, including the limitation that she "cannot reach overhead with her right upper extremity but she is not precluded from reaching with her right upper extremity." (R. 524-25). Therefore, in order to rely on the testimony of the vocational expert ("VE") in determining whether a significant number of jobs existed in the national economy that Warren could have performed, the ALJ was required to include in her hypothetical questions to the VE the limitation that Warren cannot reach overhead but was not precluded from reaching with her right upper extremity. *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.").

In this case, the ALJ asked the VE to assume the limitations of the ALJ's residual functional capacity determination. This hypothetical included the limitation that Warren "should not perform overhead reaching with the right dominant upper extremity" although the ALJ specified that Warren was otherwise "not preclude[d] [from] reaching . . . with the right upper extremity." (R. 561-62, 566). The VE testified that, given those restrictions, Warren could perform the jobs of ticket taker/seller, medical supplies packer, and car wash attendant. (R. 567). The VE confirmed that his testimony in this regard was "consistent with

the *Dictionary of Occupational Titles*" ("DOT").  (R. 567).

Warren argues, however, that the DOT specifies only that the jobs of ticket taker/seller, medical supplies packer, and car wash attendant require "reaching."  As the VE testified, the word "reaching" is used throughout the DOT to refer to extending the arms away from the body in any direction; the DOT does not distinguish between overhead reaching and reaching in any other direction.  (R. 564).  According to Warren, because the DOT is not more specific about the directional reaching requirements of the jobs of ticket taker/seller, medical supplies packer, and car wash attendant, the VE could not reasonably have testified that these particular jobs require no *overhead* reaching with the right arm.

The law does not support Warren's theory that a VE cannot provide more specific information about the reaching requirements of a job than is contained within the DOT.  "The DOT 'is not the sole source of admissible information concerning jobs,'" and "the SSA itself does not consider the DOT dispositive," *Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999) (quoting *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.1994)).   One "vital" function of a VE is to "supplement the DOT data" where the DOT provides insufficient detail regarding job requirements.  *Jones*,  190 F.3d at 1230.

Here, the VE specifically stated that his testimony was consistent with the DOT (R. 567), and there is simply no basis to conclude that, contrary to the testimony of the VE, the "reaching" requirement referenced in the DOT necessarily refers to overhead reaching with

26

the right upper extremity.  Moreover, the Eleventh Circuit has held that reliance on the DOT is strictly within the discretion of the ALJ and "an ALJ may rely solely on the VE's testimony," even where the VE's testimony conflicts with the DOT.  *Id*.  Further, the court notes that the VE specifically stated that he had personally "performed at least one, if not more, ergonomic job studies" on the job of ticket taker/seller "in the past ten years."  (R. 564).  The VE's testimony supplements the information contained in the DOT and constitutes substantial evidence that the jobs of ticket taker/seller, medical supplies packer, and car wash attendant require no overhead reaching with the right upper extremity.  *Jones*, 190 F.3d at 1230 (quoting *Dictionary of Occupational Titles*, Special Notice at xiii (4th ed.1991)) ("The DOT itself states that it is not comprehensive. It provides occupational information on jobs in the national economy, and it instructs 'DOT users demanding specific job requirements [to] supplement th[e] data with local information detailing jobs within their community.'").

Accordingly, the ALJ did not err in relying on the testimony of the VE to supplement the information available in the DOT regarding the overhead reaching requirements of the jobs of ticket taker/seller, medical supplies packer, and car wash attendant.  *Jones*, 190 F.3d at 1230 ("[T]he ALJ *should* supplement the DOT data with local information detailing jobs in the regional community. The VE provides this vital information."  (emphasis added)); *see also Wilson*, 284 F.3d at 1227-28 ("The ALJ properly utilized the . . . testimony of the VE in finding that a significant number of jobs exist in the economy that [the claimant] could

27

perform. Also, the record is devoid of any objective medical evidence to support [the claimant's] subjective assertions of [shoulder] pain and extreme limitations. . . . [T]he ALJ's decision was supported by substantial evidence.").

## V. Conclusion

For the reasons as stated, the court concludes that the decision of the Commissioner denying benefits to Warren should be affirmed.  *See Landry v. Heckler*, 782 F.2d 1551, 1551-52 (11th Cir. 1986) ("Because the factual findings made by the [ALJ] . . . are supported by substantial evidence in the record and because these findings do not entitle [the claimant] to disability benefits under the appropriate legal standard, we affirm.").

The Court will enter a separate final judgment.

Done this 21st day of March, 2014.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

28